ORIGINAL

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2003 MAY 12 AM 10: 54

CLERK_____
SO. DIST. OF GA.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Plaintiff,

v.                               402CV243

GULFSTREAM AEROSPACE
CORPORATION,

Defendant.

## ORDER

### I. INTRODUCTION

On 12/3/02, the Court preliminarily approved the Consent Decree entered into between the plaintiff Equal Employment Opportunity Commission (EEOC) and defendant Gulfstream Aerospace Corporation (Gulfstream) in this action for alleged violation of the Age Discrimination Employment Act (ADEA), 29 U.S.C. § 623(a), for discharging employees over 40 because of their age. The Court held a fairness hearing on 4/28/03, at which time arguments from the parties and objections to the settlement were heard. The parties now seek the Court's final approval of the Decree.

### II. BACKGROUND

#### A. The Reduction In Force

In 9/00, Gulfstream implemented a reduction in force (RIF) that discharged 150 employees from its Savannah facility. Doc. # 22 at 1. Subsequently, the EEOC received numerous charges of age discrimination from discharged employees. Doc. # 24 at 2. After extensive investigation and data gathering, the EEOC determined that the RIF had a disproportionate impact on employees aged 40 and above, and it issued "cause" determinations to the charging parties. *Id.* at 5.

The EEOC then began conciliation discussions with Gulfstream. *Id.* Many of the discharged employees joined in their own class action. *Cosper v. Gulfstream Aerospace Corp.*, Case 402CV013 (S.D.Ga. 10/4/01). After a lengthy conciliation process, the EEOC and Gulfstream agreed upon a settlement, and on 11/15/02 the EEOC filed this action (doc. # 1), then submitted the proposed Consent Decree. Doc. # 4. Gulfstream denies liability but is settling to avoid the expense and uncertainty of litigation. *Id.* at 3.

#### B. The Consent Decree

This Consent Decree seeks to resolve, on behalf of all "covered persons,"[1] all actions for both monetary and non-monetary relief on claims that Gulfstream laid off employees, or forced them to retire, because of their age. *Id.* at 5-6. It provides both compensatory and injunctive relief. It thereby seeks to vindicate

---

[1] A "covered person" is an employee: (1) who was over the age of 40 at the time of the "voluntary or involuntary layoff or retirement," doc. # 4 at 6; (2) who was a "regular full-time employee[] of Gulfstream at its Savannah, Georgia facility," *id.*; (3) whose "involuntary layoff or retirement date ... took effect between [8/20/00 and 12/31/00]," *id.*; (4) who has not instituted or opted into an action, arising from or relating to their layoff or retirement for the above time period, and still pending as of the date of the filing of this Complaint, *id.*; and (5) who has not previously entered into an agreement with Gulfstream resolving and releasing any claim encompassed by this Decree. *Id.* The "Decree includes employees, if any, meeting these criteria who have been issued a notice of right to sue that expired prior to the date of final Court approval of this Decree." *Id.* at 6.

30

both the interests of those who were directly injured by the RIF as well as of the public more broadly, by preventing future such discrimination.

For the benefit of all "eligible claimants,"[2] Gulfstream has agreed to establish a $2,176,307 settlement fund. *Id.* Each such claimant is to be allocated a share calculated according to: (1) the claimant's hourly rate as of 9/29/00, *id.* at 10;[3] (2) whether the claimant timely filed an EEOC charge, *id.*; (3) the claimant's age as of 9/29/00, *id.*; (4) the claimant's years of service with Gulfstream as of 9/29/00, *id.*; and (5) the length of time, if applicable, the claimant was out of work before being rehired by Gulfstream. *Id.*

There are 66 eligible settlement claimants who will receive an average pre-tax payment of approximately $33,000. Doc. # 24 at 1, 17. The Decree's payment schedule limits maximum payment to four times that average $33,000 payment (*i.e.*, $132,000) and minimum payment to no less than one-quarter that amount (*i.e.*, $8,250). Doc. # 4 at 10.

During the Decree's term, Gulfstream also agrees not to undertake any RIF that discriminates against an employee over forty on the basis of age, nor retaliate against any person who has opposed a practice or policy as discriminatory. *Id.* at 9. Should, during that term, Gulfstream engage in any Savannah facility RIF involving at least 75 employees over the course of six months, it must provide the EEOC with a report documenting various specified RIF aspects. *Id.* at 15-16.

Gulfstream will also, during the Decree's term, maintain a web page posting all vacancies at its Savannah facility so eligible claimants may apply. *Id.* at 17. And, it will provide management training concerning the Decree and Gulfstream's obligations under the ADEA. *Id.* at 18. It will also develop and submit to the EEOC a non-discrimination policy, with specific reporting, investigative, and resolution procedures. *Id.* at 19.

Gulfstream further agrees to submit a report to the EEOC, at the end of each six month period, listing all employee complaints of age discrimination at the Savannah facility. *Id.* at 19-21. Gulfstream must also satisfy specified notice requirements regarding the Decree, so as to provide its employees with full information concerning the settlement. *Id.* at 21. Finally, the EEOC retains the right to enter Gulfstream's premises to monitor its compliance with these provisions and to review documents and interview employees for this purpose. *Id.* at 21.

With respect to enforcement, the Decree specifies that the individuals of the affected class have no private right of enforcement. *Id.* at 23. It permits the parties, Gulfstream and the EEOC, to appeal to this Court for enforcement only as a last resort. While the Court shall retain jurisdiction to enforce the Decree, the Parties agree to seek its assistance only after private negotiations have broken down, and then only after setting forth with specificity the efforts they have made to comply with the Decree's enforcement provisions. *Id.* at 8. Finally, the Decree terminates this Court's jurisdiction two years from the date of the Court's final approval. *Id.*

---

[2] The class of "eligible claimants" includes all "covered employees" less those the EEOC "determines voluntarily separated from their employment with Gulfstream." Doc. # 4 at 7. Those who "voluntarily separated" receive no monetary compensation under the settlement.

[3] Or, this would be based on the rate as of the time of termination, if it occurred prior to 9/29/00.

2

On 12/3/02, the Court granted preliminary approval of the Decree, doc. # 4, and scheduled a fairness hearing for 4/28/03 (as required by ¶ VIII of the Decree, doc. # 4 at 14). The parties were then to send notice to all affected persons, in accordance with ¶¶ VII & VIII of the Decree, informing them of the proposed settlement and of their right to voice objections.

In all, six objections were filed, five of which came from eligible claimants. The Court held the 4/28/03 fairness hearing, at which time those persons and counsel for those persons who had timely filed written objections were permitted to address the Court.

## II. ANALYSIS

### A. General Standards

"A consent decree is essentially a settlement agreement subject to continued judicial policing." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983); *United States v. City of Miami*, 664 F.2d 435, 439-40 (5th Cir. 1981) (en banc). It has attributes of both a contract and of a judicial act. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10 (1975); *Stotts v. Memphis Fire Department*, 679 F.2d 541, 556 (6th Cir. 1982).

So "[o]n the one hand, a consent decree is a voluntary settlement agreement which could be fully effective without judicial intervention." *Williams*, 720 F.2d at 920. But on the other, it is "a final judicial order.... [and j]udicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties." *Id.*

"Once approved, the prospective provisions of the consent decree operate as an injunction." *Id.* The Court retains jurisdiction over the Decree during the terms of its existence and may enforce the Decree with its contempt powers or modify its terms should that become necessary. *See In re Southern Ohio Correctional Facility*, 1999 WL 775830 at * 6 (6th Cir. 1999).

Judicial approval, therefore, may not be obtained for an agreement which is illegal, a product of collusion, unconstitutional, or contrary to the public interest. *See City of Miami*, 664 F.2d at 441. The Court granted preliminary approval on 12/3/02 on its initial assessment that none of the provisions were the result of fraud, overreaching, or collusion.

This preliminary approval of the Consent Decree rendered the Decree presumptively reasonable. *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980) ("[a] Consent Decree proposed by a private defendant and government agency in an employment discrimination case carries with it a presumption of validity that is overcome only if the decree contains provisions which are unreasonable, illegal, unconstitutional, or against public policy"); *Brotherton v. Cleveland*, 141 F.Supp.2d 894, 904 (S.D.Ohio 2001); *In re Southern Ohio Correctional Facility*, 173 F.R.D. 205, 211 (S.D.Ohio 1997).

This Court now must make a final determination of whether the "proposed decree is lawful, fair, reasonable, and adequate." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974); *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981).

3

Moreover, where the Court has found the Decree presumptively reasonable, as it has here, the burden of demonstrating that the Decree is unreasonable rests with the individuals objecting to the Decree. *Williams*, 720 F.2d at 921 (6th Cir. 1983); *Association For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D.Fla. 2002); *U.S. v. State of New Jersey*, 1995 WL 1943013 at * 11 (D.N.J. 3/14/95) (unpublished).

That means that the burden is *not* on the EEOC and Gulfstream to affirmatively demonstrate its reasonableness. *Securities & Exchange Comm'n v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("the courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment"); *E.E.O.C. v. Pan American World Airways, Inc.*, 1988 WL 224232 at * 14 (N.D.Cal. 6/17/88) (unpublished) ("The fact that a government agency took part in the settlement negotiations is an important factor in weighing the overall fairness of the settlement").

To that end, the Court rejects Objector Noritoshi Itoi's argument (doc. # 28 at 4; Fairness Hearing Transcript (hereafter, "T") at 30) -- placing this burden on the settlement's proponents -- because that erroneously relies on F.R.Civ.P. 23, private class action law, where the risks of collusion or the neglect of minority interests are high. *See Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1993). Here, where the EEOC is a party and no provision in the Decree suggests collusion or fraud, the burden shifts to the objectors. *City of Miami*, 614 F.2d at 1334; *accord Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 289 (D.Col. 1997).

The Court finally must focus on the *overall* fairness and reasonableness of the settlement, and not on its fairness to any one individual claimant. *Wilkerson*, 171 F.R.D. at 283. It therefore may not withhold approval simply because the benefits accrued from the Decree are not what a successful plaintiff would have received in a fully litigated case:

> Objections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement.... In assessing the fairness of a settlement, the Court's role is not to make a de novo determination of whether the measures applied to all claimants provide each individual with a satisfactory recovery. Rather, the criteria or methodology employed by the litigants is sufficient if its terms, when applied to the entire group of individuals represented, appear reasonable.

*Wilkerson*, 171 F.R.D. at 283 (quoting *EEOC v. McDonnell Douglas*, 894 F.Supp. 1329, 1335 (E.D.Mo. 1995)); *see also U.S. v. Trucking Employers, Inc.*, 561 F.2d 313, 317 (D.C.Cir. 1977); *Hiram Walker & Sons, Inc.*, 768 F.2d at 889 ("the parties to a settlement will not be heard to complain that the relief is substantially less than what they would have received from a successful resolution after trial"). A decree is, after all, a *compromise* which has been reached after the risks, expense, and delay of further litigation have been assessed. *See Luevano v. Campbell*, 93 F.R.D. 68, 86 (D.D.C. 1981). That typically means that both sides have accepted something less than what they expected had they fully litigated the case.

### B. Notice

"It is incumbent upon the district judge to ensure before entering a consent decree that the interests of all real parties in interest have been adequately represented." *In re Birmingham*

4

*Reverse Discrimination Employment Litigation*, 833 F.2d 1492, 1499-1500 (11th Cir. 1987) (citing *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 588 n. 3 (1984) (O'Connor, J., concurring) ("[I]f innocent employees are to be required to make any sacrifices in the final consent decree, they must be represented and have had full participation rights in the negotiation process")). As a matter of due process, members of plaintiff class must receive the "best notice practical under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950); *Williams*, 720 F.2d at 921 ("[n]otice should be given to all individuals who may be affected by the decree").

Here the Consent Decree provides extensive direct-mail notice requirements. Gulfstream was required to mail an Exclusion Notice (attachment F) to all those determined by Gulfstream to have *voluntarily* left the company and thus who are not covered by the Decree. *See* Doc. # 4 at 14 (Decree ¶ VII). That provided those parties with an opportunity to file objections and for Gulfstream and the EEOC together to review same.

Similarly, the Parties were to mail to each Eligible Claimant (*i.e.*, *involuntarily* severed/retired employees) a Notice of Fairness Hearing and Opportunity to Object (attachment G) summarizing the terms and conditions of the Decree and explaining the procedure for issuing any objections. *See* doc. # 4 at 15 (Decree ¶ VIII).

In conformity with these provisions, Gulfstream reports that it mailed notices via certified mail, return receipt requested, to the most recent address on file with the company for all 66 eligible claimants. Doc. # 22 at 7 n. 4. "Several notices were returned as undeliverable, some on multiple occasions. Notices were resent where Gulfstream could locate more recent addresses through forwarding orders." *Id.* The EEOC also provided more recent addresses where possible. *Id.* Gulfstream reports that "ultimately, all but five of the eligible claimants have indicated their receipt of the notices." *Id.*[4]

In light of these thorough notice provisions and Gulfstream's self-reporting of the steps taken, the Court concludes that notice was adequately given and that due process protections were sufficiently afforded.

### C. Fairness

"Although this is an ADEA enforcement action as opposed to a class action, the settlement agreement embodied in the Consent Decree proposed here is subject to the same standard of fairness, adequacy and reasonableness that applies to settlements of class actions governed by Fed.R.Civ.P. 23." *EEOC v. McDonnell Douglas Corp.*, 1993 WL 468903 at * 4 (E.D.Mo. 8/12/93) (unpublished) (citing *Binker v. Commonwealth of Pennsylvania*, 977 F.2d 738, 747 (3d Cir. 1992)). In assessing the fairness, reasonableness and adequacy, then, of proposed Consent Decrees like this one, courts generally consider the following factors:

(1) whether the proposed settlement was fairly and honestly negotiated;

---

[4] The parties do not address Gulfstream's compliance with ¶ VII of the Decree (Exclusion Notice mailing). Nevertheless, because notice to excluded parties does not implicate the same due process concerns as notice to eligible claimants, the absence of this information need not prevent the Court from approving the Decree.

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the likelihood of success at trial;

(5) the range of possible recovery;

(6) the judgment of the parties and their counsel that the settlement is fair and reasonable;

(7) the substance and amount of opposition to the settlement;

(8) whether the Decree protects the public interest.

See *EEOC v. Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *Williams*, 720 F.2d at 923; *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 688-89 (N.D.Ga. 2001); *Wilkerson*, 171 F.R.D. at 283.

### 1. *Honest and Fair Negotiation*

The EEOC and Gulfstream have documented the "extensive and difficult negotiations" that produced the proposed settlement here. *See* doc. # 22 at 6-7; # 24 at 5-9, 13. The EEOC initially undertook extensive investigations of the charges against Gulfstream. This included interviews with corporate officials with knowledge of the 2000 RIF policies and of Gulfstream's employee data system. Doc. # 24 at 3. It also included detailed analysis of Gulfstream's employee data, *id.* at 4, with the aid of the EEOC's statistical expert. *Id.*

Beginning in 10/01, the EEOC and Gulfstream convened a number of conciliation meetings. *Id.* at 5. Counsel for the *Cosper* class action (which had already been filed) also met with the parties at many of these discussions and took part in the early negotiations. *Id.* A fundamental disagreement over the interpretation of RIF data, however, divided the EEOC and Gulfstream throughout these negotiations. Gulfstream contended that the 2000 RIF had a statistically significant disparate impact on 23 persons age 40 and older. *Id.* Gulfstream challenged this analysis, and argued that "using the appropriate methodology the maximum statistical [disparity] was seven persons for the entire RIF." *Id.* at 6.

The continued disagreement over the analysis of this data, as well as over "the merits of the charging parties' allegations, and [the] appropriate measure of damages" led the EEOC to conclude "that further settlement discussions would not be productive." *Id.* at 6. Upon Gulfstream's subsequent request, however, the EEOC agreed to re-open the case. *Id.* The EEOC also shifted its focus at that time, limiting its demands now to those claimants who were not part of the *Cosper* private lawsuit. *Id.* at 7. It based its new offer on information from individuals it believed would most strongly represent the remaining class. *Id.* With this approach, an agreement was finally reached on the $2,176,307 monetary settlement. *Id.* at 8. Agreement on non-monetary provisions and the terms of the Decree soon followed, and the EEOC's office of General Counsel gave its approval of the overall settlement in 11/02. *Id.* Detailing this process, both the EEOC and Gulfstream recite extensive negotiations involving a variety of EEOC and private lawyers. *Id.* at 9; doc. # 22 at 6-7.

In light of these extensive and informed negotiations, and the fact that both sides were

well represented by such experienced and able counsel, the Court has no reason to doubt that both parties had their respective positions vigorously advocated. Furthermore, no objector even alleges, much less advances, any facts or evidence of fraud, collusion or overreaching in connection with the lengthy discussions or the terms of the Consent Decree.

The Court thus concludes that the result reached here was the product of arms-length, honest and fair negotiations. *See McDonnell Douglas*, 894 F.Supp. at 1333-34 (no evidence of fraud or collusion where EEOC undertook a lengthy and thorough investigation of discrimination charges, the parties engaged in extended negotiations, and both sides were represented by counsel experienced in the area of employment discrimination law); *Wilkerson*, 171 F.R.D at 285.

### 2. *Complexity, Expense, and Likely Duration of the Litigation*

As Gulfstream emphasizes, "class action employment discrimination lawsuits have a well-deserved reputation for being complex." *Cotton*, 559 F.2d at 1331. And "[t]he track record for large class action employment discrimination cases demonstrates that many years may be consumed by trial(s) and appeal(s) before the dust finally settles." *Officers for Justice v. Civil Service Comm'n of City and County of San Francisco*, 688 F.2d 615, 629 (9th Cir. 1982).

This case is no exception. While the Court can only speculate, further discovery and trial preparation would very likely be burdensome and expensive. And the trial itself would no doubt be lengthy, with almost certain appeals of all unfavorable results. *See McDonnell Douglas*, 894 F.Supp. at 1334 (concluding in Title VII discrimination case that "expense involved in prosecuting and defending this action would be great" and "[t]hat the attorneys fees and litigation costs could easily reach an amount equal to a significant percentage of the monetary settlement is not beyond the realm of possibilities").

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed*

While no formal discovery has been conducted in this case, the EEOC carried out an extensive and thorough investigation and analysis of the facts, prior to filing its Complaint, as described *supra*. The Court thus concludes that the case was brought to "a point at which an informed assessment of its merits and the probable future course of the litigation... [could reasonably] be made." *McDonnell Douglas*, 894 F.Supp. at 1334; *see also McDonnell Douglas*, 1993 WL 468903 at * 5; *Wilkerson*, 171 F.R.D. at 289 (amount of discovery and investigation "support[ed] the conclusion that the settlement was the result of an informed and carefully considered decision by the [p]arties").

### 4. *The Likelihood of Success at Trial*

It is well-documented that "[i]n general, plaintiffs face an uphill battle in prevailing on employment discrimination cases in federal court." *Ingram*, 200 F.R.D. at 689. The *Ingram* court noted that there "Class Counsel submitted a[n academic] report ... analyzing data on federal employment discrimination cases, and the report concluded that employment discrimination plaintiffs are much less likely than other types of plaintiffs to win their cases at trial and sustain their victories on appeal." *Id.* at 689 & n. 2.

Indeed, the "data show[ed] ... [that]

7

employees win only about one-fourth of th[eir] cases." *Id.* And "[i]f the employer appeals one of those rare plaintiff wins, the employer has a 44% chance of getting the verdict reversed.... By contrast, if an employee attempts to get an employer win reversed, the plaintiff has only a 5.8% chance of success." *Id.* at 689 n. 2.

Furthermore, serious questions of law and fact exist here, placing the ultimate outcome of the litigation in doubt. Gulfstream continues to deny any liability in this matter, and at all stages of the negotiation disputed the EEOC's charge that the 2000 RIF violated the ADEA. Doc. # 22 at 18. Gulfstream contends that the contested issues include:

> (1) whether the RIF was due to age or Gulfstream's need to restructure given market conditions and future business plans; (2) the proper statistical model to be utilized in analyzing the RIF, the admissibility of certain statistical evidence, and the strength and validity of that evidence; (3) the effect of the decentralized decision-making process utilized to make RIF decisions; (4) the admissibility, weight and relevance of anecdotal evidence offered to show age animus; and (5) relevant damage calculations.

*Id.* Particularly significant is the EEOC's heavy reliance during the negotiations on their statistical analysis of the RIF's disparate impact on employees over age 40. Disparate impact is not a valid theory of recovery under the ADEA. *Adams v. Florida Power Co.*, 255 F.3d 1322, 1326 (11th Cir. 2001) ("disparate impact claims may not be brought under the ADEA").

The EEOC itself concedes that "this is not an overly strong statistical case." Doc. # 24 at 17.

"From a statistical standpoint," it submits, "for the ... 2000 RIF [which discharged 150 employees], there were approximately 18 layoffs of persons aged 40 and older, above what would have been expected by mere chance or random selection...." *Id.* At the fairness hearing the EEOC agreed that "there would have been very difficult problems facing [it] in the event it had gone to litigation, to trial." T at 19.

The EEOC also acknowledges that "there is no assurance that the EEOC could have obtained [at trial] the[] damages [obtained here in the settlement] for any of the claimants." *Id.* at 18. The absence of mitigation by some parties, and the limited availability of liquidated damages exacerbates the difficulty. *Id.*

"At this stage of the proceedings the Court has not been called upon nor should it attempt to determine the merits of either party's position." *McDonnell Douglas*, 894 F.Supp. at 1334; *Officers for Justice*, 688 F.2d at 625 ("the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits"). The positions taken by the parties make clear, however, that the prospects for establishing both liability and damages at trial are anything but certain in this case. On balance, the Court has been shown no substantial likelihood of the EEOC's success at trial.

### 5. *The Range of Possible Recovery*

The proposed settlement provides monetary benefits of $2,176,307 for 66 claimants, an average of $32,974 per claimant. Doc. # 24 at 17. No evidence, however, has been presented by any party as to what the range of possible recovery could be should the EEOC prevail at trial. Nor can the Court accurately speculate.

But the genuine difficulties of litigating the

8

case have already been noted *supra*. And a comparison of this Decree's monetary amount with court-approved EEOC settlements in other discrimination cases favors a finding that the amount here is fair and reasonable. *See, e.g., Binker v. Commonwealth of Pennsylvania*, 977 F.2d 738, 742 (3d Cir. 1992) ($2.6 million for 83 ADEA claimants, or an average of $31,325 per claimant); *EEOC v. Foot Locker Specialty Inc.*, 99 CIV 4758 (S.D.N.Y. 11/6/02) (unpublished) ($3.5 million for 678 ADEA claimants, or an average of $5,162 per claimant); *EEOC v. State*, 1997 WL 159435 at * 1 (N.D.N.Y. 2/11/97) (unpublished) ($1.2 million for 48 ADEA claimants, or an average of $25,000 per claimant); *Wilkerson*, 171 F.R.D. at 280 ($13 million for 1,777 claimants, or an average $7,315 per claimant and a settlement range of approximately $1,400 - $11,700); *EEOC v. Consolidated Edison Co. of New York, Inc.*, 557 F.Supp. 468, 469 (S.D.N.Y. 1983) ($3.5 million for 126 ADEA claimants, or an average of $27,777 per claimant).

Claimant Noritoshi Itoi objects to the amount of the monetary settlement, arguing that his direct damages alone were over $500,000. Doc. # 11 at 19. But he has not presented any evidence that a jury could award the 66 claimants here anything approximating that amount were the EEOC to prevail at trial. *See Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators" at trial) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d at 625).

Here, where the monetary recovery compares favorably to other court-approved EEOC settlements, where success at trial is highly uncertain, and where no evidence has been presented showing the inadequacy of this amount relative to a likely jury verdict, the settlement amount appears fair and reasonable. *See Batchelder v. KerrMcGee Corp.*, 246 F.Supp.2d 525, 529 (N.D.Miss. 2003) ("No evidence has been offered to the court indicating that the value of the proposed settlement is inadequate in relation to the amount that a jury could have awarded. Under these circumstances, the court concludes that the amount of the settlement, in comparison with the range of potential recovery by jury verdict, supports the fairness, adequacy, and reasonableness of the settlement").

### 6. *The Judgment of the Parties*

Although the Court is not bound by Gulfstream counsel's opinion, it is nevertheless entitled to considerable weight. *Cotton*, 559 F.2d at 1330-31. "Likewise, the opinion of the Commission as to the fairness, adequacy and reasonableness of the settlement is accorded great weight in light of the agency's expertise in employment discrimination litigation in general and its intimate knowledge of this case in particular." *McDonnell Douglas*, 1993 WL 468903 at * 6 (citing *Holden v. Burlington Northern, Inc.*, 665 F.Supp. 1398, 1422 (D.Minn. 1987)).

Here, both counsel for Gulfstream, doc. # 22 at 43, and the EEOC, doc. # 24 at 15, strongly support this Decree and argue in lengthy briefs that it is fair, adequate, and reasonable to the claimants. *See also* T. at 6-29. Their positions thus substantially favor the Court's final approval of the Decree.

### 7. *The Substance and Amount of Opposition to the Settlement*

The Court received just six objections to the

Consent Decree. One objector was simply mistaken about his inclusion among the eligible claimants and now no longer has any opposition. Doc. # 9 (LeFevre Objection); *see also* doc. # 24 attachment B (list of eligible claimants). Similarly, another raises issues unrelated to the RIF, doc. # 14 (Smith Objection), and need not be considered in detail here.[5]

Of the 66 eligible claimants, then, only 4 object to the Decree. Approximately 94% of the eligible claimants thus express no opposition to the settlement. This extremely small number of objectors is highly significant and is persuasive evidence that the Decree should be approved. *See Ingram*, 200 F.R.D. at 692 n. 7 ("While the number of objectors is not controlling, a relatively small number of objectors can be taken as some indication that the class members as a group did not think the settlement was unfair") (cites and quotes omitted).

Among the 4 remaining objectors, the primary objection to the Decree is that the settlement amount is inadequate. Doc. ## 10-12. Objector Itoi additionally argues that the EEOC should have provided him with notice of the filing of its Complaint so as to afford him the opportunity to first file his own private claim. Doc. # 11. He also argues that the allocation of the settlement amount among the claimants is unfair. *Id.*

### a. *Inadequacy of Settlement Amount*

Several respondents object that the total settlement amount is inadequate for the number of persons involved. Doc. ## 10, 11, 12, 15. In particular, two parties point to a comment made in the press by counsel in *Cosper v. Gulfstream* – the recently settled private ADEA class action -- that the settlement here was "woefully, drastically inadequate." Doc. # 11 exh. 1 at 2. They argue that Gulfstream should disclose the confidential settlement reached in *Cosper* so as to compare this settlement and determine its reasonableness and adequacy. Doc. # 11 at 19-20; # 12 at 1. The *Cosper* settlement allegedly included reimbursement of lost retirement and other benefits, something not included here. Doc. # 11 at 20.

Comparison with the *Cosper* private settlement, however, is irrelevant to assessing this agreement. First, that settlement was reached in 3/03, over four months after the parties here agreed to the Decree *sub judice*. Doc. # 22 at 34; # 24 at 29. The settlement here is completely independent of whatever subsequently occurred in the *Cosper* case.

Moreover, "[t]he EEOC is a public agency 'charged with the vindication of public policy, not merely with the enforcement of private rights.'" *Donovan v. University of Texas at El Paso*, 643 F.2d 1201, 1208 n. 15 (5th Cir. 1981) (quoting *EEOC v. Occidental Life Ins. Co. of California*, 535 F.2d 533, 542 (9th Cir. 1976), *aff'd*, 432 U.S. 355 (1977)).

Hence, any alleged differences between this settlement and the private settlement in *Cosper*

---

[5] Smith was not laid off or fired during the 2000 RIF, but now nevertheless argues that she should not be excluded from the eligible class of claimants. Doc. # 14. This complaint is without merit insofar as Smith cannot show she was *unreasonably* excluded from the settlement class. "[T]he Commission has the sole discretion to determine whether and on whose behalf to litigate claimed violations of the ADEA." *McDonnell Douglas Corp.*, 1993 WL 468903 at * 9 (citing 29 U.S.C. § 626(b)). Drawing the line between those who were laid off (or forced to retire) and those who chose to retire is certainly reasonable, especially if her departure has nothing to do with the RIF as Gulfstream contends. *See* doc. # 22 at 8. Certainly, nothing prevented Smith from bringing her own private claim against Gulfstream for whatever discrimination she feels she experienced.

may well be justified in light of the public benefits of deterring future discrimination that the EEOC secured.[6] *See Riddle v. Cerro Wire and Cable Group, Inc.*, 902 F.2d 918, 922-23 (11th Cir. 1990) ("When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination.... [T]he relationship between the EEOC and an individual victim of discrimination indicates that the interests of the two parties are not always identical. The EEOC is primarily interested in securing equal employment opportunity in the workplace.... The aggrieved individual, on the other hand, is primarily interested in securing specific personal relief.... The differing interests of the EEOC and of the aggrieved individual are not necessarily compatible").

Moreover, all parties had until 9/9/02 to "opt-in" on the *Cosper* class action and assume whatever private risks and costs that entailed. Doc. # 11 at 14. Objector Noritoshi Itoi "elected to stay with the EEOC rather than opt into the *Cosper* class action." *Id.* He and the other objectors must now live with that choice.

Finally, objector Shubber's claim that his share will not cover all his damages (in particular, his relocation and new-job-related expenses) is without merit. As explained *supra*, "objections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement." *Wilkerson*, 171 F.R.D. at 283. The Court's role in assessing the fairness of the Decree is to determine whether its terms, "when applied to the *entire* group of individuals represented, appear reasonable." *Id.* (emphasis added). To the extent any of the other objectors are implying that the Decree is unreasonable because their share of the settlement fails to adequately compensate them for individual losses and injury, *see, e.g.*, doc. # 11 at 11, their objections fail for the same reason.

### b. *Notice of EEOC Filing*

Another major complaint is that the EEOC failed to give the members of the class proper notice of the date upon which they had to decide whether to join the EEOC class or to file their own private claim against Gulfstream. See doc. # 10 at 1; # 11 at 2. The potentially most meritable objection alleges that, prior to the EEOC's filing of its Complaint in this case, class member Itoi notified EEOC attorney Tapper that he had decided to file a separate lawsuit and therefore would be opting out of the EEOC settlement. Doc. # 11 at 16.

According to Itoi, however, Tapper never returned his call concerning his opt-out decision. He later learned through a private attorney, before he had a chance to file his own Complaint, that the EEOC had filed its Complaint and that a settlement was reached, with Itoi included as a claimant. *Id.* at 16-17.

The Consent Decree specifies that "[u]pon the filing of the complaint, the right of any Eligible Claimant to institute or opt into a private action asserting claims arising from or related to the subject matter of the Commission's complaint shall be deemed to have terminated pursuant to 29 U.S.C. § 626(c)(1). *Grayson v. Kmart Corp.*,

---

[6] Thus, the terms of the *Cosper* settlement simply aren't relevant to the fairness and reasonableness of this Decree. The Court therefore overrules Itoi's Objection (doc. # 28) to the Magistrate Judge's (MJ's) 4/25/03 Order, which granted Gulfstream's motion to quash Itoi's subpoenas seeking, *inter alia*, information about the *Cosper* settlement. The Court agrees that "the reasons behind the settlement and the amount of the settlement [in *Cosper*] cannot be assumed to be relevant to the fairness of the consent decree in this case." Doc. # 27 at 8.

11

79 F.3d 1086, 1105 (11th Cir. 1996)." Doc. # 4 at 8 (Decree at ¶ II(F)); *see also* 29 U.S.C. § 626(c) (the EEOC's filing bars a private litigant's action). According to Itoi, his decision to opt out of the settlement was ignored by the EEOC, depriving him of the alternative path he chose of filing a private complaint against Gulfstream. Doc. # 11 at 17.

Itoi supports this argument by contending that the EEOC breached its fiduciary duty in failing to inform him of the imminent filing of its action against Gulfstream, which deprived him of the opportunity to file his own claim. *Id.* at 22. He argues that the EEOC attorneys were acting as "de facto counsel for the employees," *id.*, and that therefore they "should have given prior notification to Mr. Itoi of the time that they would file an action which would preclude him from filing a separate action when the attorneys had been informed that Mr. Itoi intended to do so." *Id.* at 24.

Itoi's fiduciary duty argument is without legal support. *See Wilkerson*, 171 F.R.D. at 294 ("EEOC does not function as a private attorney who is required to gather information from his or her clients and to confer with them regarding the litigation and potential settlement"); *Williams v. U.S.*, 665 F.Supp. 1466, 1469-70 (D.Or. 1987) ("EEOC did not have an attorney-client relationship with the potential claimants against [employer]. Therefore, even if the EEOC was negligent in carrying out the consent decree, it *owed no duty to the plaintiffs* and thus is not liable under this theory") (emphasis added); *see also E.E.O.C. v. Johnson & Higgins, Inc.*, 887 F.Supp. 682, 688 (S.D.N.Y. 1995) ("Where there is a violation of the ADEA, the EEOC may proceed ... without the consent of, and indeed *even against the wishes of*, those individuals aggrieved") (emphasis added).

To protect his right, Itoi was required to file his action ahead of the EEOC's -- and if not, he's foreclosed from complaining about it now. His privately filed ADEA action would have remained viable post-EEOC filing, even if Itoi had been named in the EEOC complaint. *E.E.O.C. v. Eastern Airlines, Inc.*, 736 F.2d 635, 640-41 (11th Cir. 1984). Itoi's own delay in filing deprived him of the advantage and opportunity he now seeks.

Itoi also was on notice that the settlement might not satisfy his expectations. He explains that, "after several months, [he] began to have concerns that the case was moving along too slowly." Doc. # 11 at 11. Itoi's daughter, on his behalf, began contacting EEOC counsel on 4/9/02, more than seven months before the EEOC filed its complaint. *Id.* And sometime in late September, his daughter told EEOC counsel Tapper that Itoi "would expect no less than $350,000.00." *Id.* at 15. Tapper replied that "the settlement probably would not be that much...." *Id.*

Aware that the settlement would "probably" be less than he expected, Itoi had plenty of time to file his own action ahead of the EEOC's. Had he done so, the EEOC complaint would not have extinguished his claim, and he now would be free to choose either to accept the current settlement or go forward with his private action. *Wilkerson*, 171 F.R.D. at 279.

### c. *Allocation of Settlement Amount*

Itoi further argues that the settlement allocation is unfair. *Id.* at 27. But here he relies on caselaw concerned with *disparity in the distribution of benefits*, while this Decree carefully prevents any such disparity by limiting the maximum payment to four times the average share and the minimum to one-fourth. Doc. # 4

12

at 10. Although expressed in "disparity" language, then, Itoi's real complaint is that he is individually being forced to accept reduced compensation for his more valuable claims, so as ultimately to benefit other class members with less valuable claims. *Id.* at 2.

This can be a genuine issue of concern in *Rule 23* private class actions where counsel has its own financial stake in the outcome. *See Staton v. Boeing Co.*, ___ F.3d ___, 2003 WL 1964051 at * 9 (9th Cir. 3/29/03) ("concerns about the fairness of settlement agreements warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement"). But the interests and incentives of the EEOC are presumed to differ from those of counsel in a private class action. *See Wilkerson*, 171 F.R.D. at 289.

The risks of collusion, or of inadequate representation of some of the class, are simply not present here to the same degree. And the court finds no evidence to otherwise suggest that Itoi's interests went unrepresented. The fact here that relief is equitably afforded all 66 claimants, despite the relative weakness of many of their claims, is a strength of this particular settlement. *See McDonnell Douglas*, 1993 WL 468903 at * 6 (emphasizing that "the proposed settlement clearly affords a greater opportunity for a larger number of potential victims to obtain relief"); *EEOC v. Commonwealth of Pennsylvania*, 772 F.Supp. 217, 221 (M.D.Pa. 1991) ("there exists the risk that the interests of some class members may be sacrificed in the effort to achieve the greatest good for the greatest number.... In fact, settlement distributions premised on a basis other than the merits of individual claims are common") (quotes and cites omitted).

Finally, Itoi's argument that the Court should permit him to opt-out of the settlement, to pursue his own claim, must fail. Doc. # 11 at 29. Unlike in Rule 23 private class actions, no opt-out provision exists in ADEA enforcement actions. *Compare Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) (Rule 23), *with McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 357 (1995) ("[The ADEA's] remedial provisions incorporate by reference the provisions of the Fair Labor Standards Act of 1938"; it is not enforced according to Rule 23).

### 8. *The Public Interest*

"In making the reasonableness determination after the fairness hearing, the court is under the mandatory duty to consider the fairness of the decree to those affected, the adequacy of the settlement to the class, *and the public interest*." *Lindsey v. Memphis-Shelby County Airport Authority*, 2000 WL 1182446 at * 5 (6th Cir. 8/15/00) (unpublished) (emphasis added). This is because "the ADEA is designed not only to address individual grievances, but also to further important social policies such as deterrence of employment discrimination and prevention of future discrimination through class-wide relief." *EEOC v. North Gibson School Corp.*, 266 F.3d 607, 616 (7th Cir. 2001); *US EEOC v. Massey Yardley ChryslerPlymouth, Inc.*, 117 F.3d 1244, 1253 (11th Cir. 1997).

Important provisions of this Consent Decree are indeed aimed at vindicating the public interest. These include reporting requirements imposed on Gulfstream concerning certain future RIFs, doc. # 4 at 15-16, as well as any employee complaints of age discrimination at the Savannah facility. *Id.* at 19-21. Gulfstream also agrees to develop and implement a detailed non-discriminatory policy, *id.* at 19, and to provide management training regarding the

Decree and the ADEA. Id. at 18. Finally, it consents to EEOC monitoring of its compliance with the terms of the Decree. *Id.* at 21.

Objector Itoi's criticism that this injunctive relief in no way benefits class members like him (*i.e.*, ex-employees) thus misses the point. *See* doc. # 11 at 29. These provisions are aimed at preventing future discrimination; securing such provisions constitutes a critical component of the EEOC's role under the ADEA scheme.

## IV. CONCLUSION

"A settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial." *Shuford v. Alabama State Bd. of Educ.*, 897 F.Supp. 1535, 1550 (M.D.Ala. 1995) (cite and quotes omitted). "As a result, the question is not whether the proposed consent decree is the best deal possible, but whether it is at a minimum, fair, adequate, and reasonable." *Id.* (cite and quotes omitted).

Based on the foregoing analysis, the Court finds the Consent Decree fair, adequate, and reasonable. Accordingly, the Court *GRANTS* final approval of the EEOC/Gulfstream Consent Decree. Doc. # 4. For the two-year term of the Decree, the Court shall retain jurisdiction over the parties for purposes of compliance with this Decree. Otherwise, the EEOC's Complaint (doc. # 1) is *DISMISSED WITH PREJUDICE.* Finally, the Court *OVERRULES* the Objection (doc. #28) to the Magistrate Judge's 4/25/03 Order.

This 12 day of May, 2003.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA